NAGEL, Respondent, v. THE FARMERS EXCHANGE, et al, Appellants.

(266 N. W. 722.)

(File No. 7858. Opinion filed April 24, 1936.)

*Morrison & Skaug,* of Mobridge, and *Herbert F. Horner,* of Minneapolis, Minn., for Appellants.

*P. M. Burns* and *T. C. Gorman,* both of Timber Lake, for Respondent.

RUDOLPH, J. On September 13, 1933, the plaintiff in this action obtained a judgment against the defendant Farmers Exchange in the amount of $992.10. Execution was issued upon this judgment, which was returned unsatisfied by the sheriff, for the reason that no property was found upon which a levy could be made. Thereafter this action was brought to set aside as fraud-

ulent the conveyance of certain elevator properties made by the Farmers Exchange to the defendant Hoover Grain Company, and subsequently transferred by the grain company to the defendant George Hurd. The trial court found the conveyance constructively fraudulent within the meaning of section 4, chapter 209, Laws 1919, and set it aside. In this appeal the defendants first question the sufficiency of the evidence to sustain a finding by the trial court to the effect that the major portion of the alleged consideration for the transfer to the Hoover Grain Company was not the debt of the Hoover Grain Company, but was, in fact, the personal debt of one S. J. Simonson.

The facts disclose that S. J. Simonson and his wife were the principal stockholders of the Farmers Exchange, the owner of the elevators here in question. Simonson was president of the corporation, and his wife was secretary-treasurer. The plaintiff, Nagel, was employed to conduct the elevator business. The elevator company did business with the defendant Hoover Grain Company during all of the times that Nagel was manager. The Hoover Grain Company was located in Minneapolis, engaged in the business of a grain commission merchant, and it was through the Hoover Grain Company that the elevator company bought options on the board of trade. Many option deals were transacted with the Hoover Grain Company by Mr. Simonson, and the question presented is whether or not the evidence is sufficient to show that these transactions by Simonson were, in fact, his own personal transactions, or were conducted for and on behalf of the elevator company. The claimed consideration for the transfer of the elevators to the Hoover Grain Company was the loss incurred because of these option transactions conducted by Mr. Simonson. The trial court held that these transactions were the personal deals of Mr. Simonson, and therefore constituted no consideration for the transfer by the elevator company to the Hoover Grain Company. We have carefully reviewed the evidence, and are satisfied that the evidence is sufficient to sustain the findings of the trial court.

There is evidence in the record that Mr. Simonson and a man in the employ of the Hoover Grain Company, one Chuck Williams, were conducting these option trades for their own personal benefit,

and the plaintiff testified that in each instance, when the losses on these trades were charged to the elevator company, he notified a representative of the Hoover Grain Company that the trades did not constitute an elevator transaction. Nagel further testified:

"I had some talk with Sam Hoover, the president of the Hoover Grain Company, regarding these transactions, about the first week in February, 1931, at Minneapolis. He said that S. J. Simonson didn't put any margins up for these trades and he had no way of getting his money out of them unless he took them out of the elevator account, and so he charged these Simonson option trades to the elevator account.

"I told him that these option trades were charged to the elevator account, which weren't any legitimate elevator deals. Hoover said he would take the charges off as quick as Simonson paid up these option losses. Hoover said Simonson made the trades when he was in Minneapolis. He refused to take them off the elevator account until such time as they were paid up."

We think there is ample in this record upon which to base a finding that these option trades were, in fact, the personal business of Mr. Simonson, and understood as such by the defendant Hoover Grain Company. The record disclosing that the Hoover Grain Company understood these transactions to be the personal deals of Mr. Simonson, the question of Simonson's authority to bind the corporation in trading of this kind is not here involved.

The record discloses that at one time notes were given to the Hoover Grain Company, signed by Simonson, as president of the Farmers Exchange, and Nagel, as manager, for the purpose of taking up some of the losses incurred by the trades of Mr. Simonson. The notes were never paid, and the Hoover Grain Company, in the absence of the payment of the notes, simply made a charge again on the books of the company against the Farmers Exchange. The giving of these notes did not constitute payment of the account. Eggleston v. Plowman, 49 S. D. 609, 207 N. W. 981, 44 A. L. R. 1231. The most that can be said about the giving of these notes is that the notes constituted evidence that the debt was, in fact, the debt of the Farmers Exchange, but, as stated above, the trial court on conflicting evidence held that the debt was one incurred by Simonson in his personal capacity, and we are not dis-

posed to disturb that finding. The notes were not offered in evidence, and it does not appear that they were in the form of corporate notes. The only evidence is that they were signed by the president and manager of the corporation.

■ ■ Shortly after the transfer to the Hoover Grain Company by the Farmers Exchange, the Hoover Grain Company entered into a conditional sales contract with the defendant George A. Hurd wherein the property was turned over to Mr. Hurd under the following conditions as stated in appellant's brief: "Title is reserved in the seller (Hoover Grain Company) until the full purchase price is paid. Purchaser (George A. Hurd) is to conduct the elevator business at Timber Lake in the elevators sold, and turn all of the proceeds over to the Hoover Grain Company to apply on the purchase price, after retaining a salary of $125.00 per month."

There is no showing in this record that at the time the complaint herein was served upon the defendant Hurd he had paid anything to the Hoover Grain Company. Hurd was simply operating the elevators and taking out a salary of $125 per month under the agreement above set forth. Under these circumstances, we do not believe that Hurd was a bona fide purchaser within the meaning of that term and entitled to protection as against this plaintiff. Hurd had paid nothing; he was simply operating the elevator and being paid therefor $125 per month for his services. There is no showing that the elevator, while being conducted by Hurd, had made any more than he was being paid. If the sale is set aside, Hurd will be in no worse position than he would be if the purported sale to him had not been attempted. "The rule supported by the weight of authority is to the effect that it is essential to constitute one a bona fide purchaser from a fraudulent grantee that a valuable consideration shall have passed before notice of fraud or that something of value shall have been parted with, such as the surrender of a valuable right, or the assumption of an irrevocable obligation." 27 C. J. 698.

Counsel for appellant at the oral argument stressed the fact that in his opinion the trial court decided this case upon the theory that it was an unlawful preference by an insolvent corporation. But a careful reading of the findings convinces us that the trial

court decided this case upon the theory that the transfer by the Farmers Exchange to the Hoover Grain Company was without consideration, and that this transfer rendered the Farmers Exchange insolvent within the meaning of section 4, chapter 209, Laws 1919.

The judgment and order appealed from are affirmed.

POLLEY, P. J., and ROBERTS, J., concur.

WARREN, J., dissents.

CAMPBELL, J., not sitting.